# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES ALLEN RUSSELL,<br><br>　　　　　　　Petitioner,<br><br>　v.<br><br>ROSEANN CAMPBELL,<br><br>　　　　　　　Respondent. | 1:04cv6726 OWW DLB HC<br><br>FINDINGS AND RECOMMENDATION REGARDING SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS<br><br>(Document 10) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### PROCEDURAL HISTORY[1]

On September 28, 2001, in the Fresno County Superior Court, a jury convicted Petitioner of (1) kidnapping to commit another crime, in violation of California Penal Code section 209(b)(1); (2) aggravated sexual assault of a child - oral copulation, a violation of California Penal Code section 269(a)(4); (3) three counts of aggravated sexual assault of a child - sexual penetration by force, violations of California Penal Code section 269(a)(5); (4) four counts of

---

[1] This information is derived from Petitioner's second amended petition for writ of habeas corpus and Respondent's answer to the petition.

1

forcible lewd acts upon a child, violations of California Penal Code section 288(b)(1); and (5) indecent exposure with a prior conviction for indecent exposure, a violation of California Penal Code section 314(a). The jury found several aggravating facts to be true, including the fact that Petitioner had served time for one prior serious felony conviction. He was sentenced to an aggregate term of 82 years to life.

Petitioner appealed to the Fifth District Court of Appeal. On July 8, 2003, the court affirmed Petitioner's conviction and sentence.

Petitioner next filed a petition for review in the California Supreme Court. The court denied the petition on September 10, 2003.

Petitioner filed the instant federal petition for writ of habeas corpus on December 8, 2004, in the Sacramento Division of this Court. The case was transferred to the Fresno Division on December 17, 2004. Pursuant to Court order, Petitioner filed a second amended petition on November 16, 2004. Petitioner alleges that (1) he was denied effective assistance of counsel; and (2) the trial court committed sentencing error.

Respondent filed its answer on June 24, 2005.

Petitioner did not file a traverse.

STATEMENT OF FACTS[2]

**The Sexual Attack in the Alley**

At approximately 11:30 a.m. on January 10, 2000, Ong X. took her four-year-old daughter, P., with her to Winchell Elementary School in Fresno to pick up P.'s older brother, N. Ong parked her car in front of the school grounds on Eighth Street. She left P. near a fence outside the school to watch a soccer game while she went to find N. When Ong returned five minutes later, P. was gone. Ong looked for P. but could not find her. When Ong returned to her car, she saw P. running from the north side of the street toward her and that P.'s pants were wet. P. cried loudly that "[s]omebody stole me."

---

[2] This statement of facts is taken from the July 8, 2003, opinion of the Fifth District Court of Appeal.

1    P. had been wearing a pair of black and white checkered pants, a white T-shirt, and a gray
2 sweatshirt. Ong took P.'s pants off and noticed there was blood draining from her anus. She
3 took her children home and got a relative, Pakou, who could speak English. P. changed her pants
4 at home and left them there. Ong saw "[l]ots of blood and kind of sticky" while P. cleaned
5 herself. P. then put on a pair of blue pants.
6    Ong, Pakou, and P. returned to the elementary school. Through Pakou, Ong told the
7 principal what had happened. The principal immediately called the police. P. told an officer,
8 with Pakou serving as a translator, that the man who attacked her was a short bearded Hispanic
9 man wearing green pants. Ong later explained there is no Hmong word for moustache or beard,
10 but rather one for facial hair. In addition, there is no Hmong word for Hispanic or Mexican, and
11 Ong doubted P. knew the word Hispanic.
12    P. told Officer Chang that she had been playing and that it happened in the alley next to
13 the school. A two-door red car pulled up and a man came out, grabbed her by her shirt, and
14 forced her in the back of the car. While inside, the man pulled down his pants and forced his
15 penis into her mouth and moved it around. P. told Officer Change the man smelled like urine
16 and that he put his finger in her "pee hole." P. described the man's penis as "being fat." P. told
17 Officer Chang the man was a short bearded Mexican, using a Hmong abbreviation, "Mev,"
18 meaning Mexican. She gestured to her face to indicate the man had a beard. Officer Change did
19 not ask P. if the man had a moustache.
20    While she was in the ambulance, the officers asked P. to look at a short bearded Mexican
21 man and a red car to see if she could identify them. Ong recalled that P. recognized the car but
22 that the man "absolutely was not" the man who assaulted her. After looking at the man, P. did
23 not think he was the perpetrator because he did not have hair across his upper lip, motioning with
24 her hand to indicate the upper lip. Officer Chang also remembered that P. looked out the
25 ambulance window at the suspect and stated, "No, that's not him," referring to Pedro Elias. Ong
26 recalled that P. told the officer the perpetrator had a handlebar moustache and reddish-colored
27 hair.
28

Pediatric nurse practitioner Sandra Knudson examined P. at the hospital. She observed that P. was calm and cooperative, but that could have been because she was in shock. When P. first arrived, Knudson spoke with Officer Jennifer Walzberg and Ong about what had happened. Ong told Knudson she had placed P. in the bathtub, washed her, dried her with toilet paper, and put fresh pants on her.

P.'s clothing was placed in a sexual assault kit at the hospital. The checkered pants P. had been wearing were brought to the hospital by Officer Walzberg and given to Knudson. They were placed in an evidence bag as part of the sexual assault kit with the rest of P.'s clothing.

Knudson found that P. had bruising consistent with being choked and assaulted and discovered significant trauma in P.'s genital area consistent with a recent penetrating vaginal injury.

Knudson did not see any trauma to P.'s anus, such as redness, bruising, tearing, fecal matter, or bleeding, which would suggest anal penetration. However, she explained that such findings do not rule out the possibility of anal molestation. She indicated that she had done examinations where she found no injuries to the anus, even though this type of touching had been reported by the victims. Knudson did not detect any semen or pubic hair on P.'s body.

**The Indecent Exposure Incidents**

On February 4, 2000, two Asian girls, V. and B., saw a White male masturbating in a car parked outside Hidalgo Elementary School, which is a couple of miles from Winchell Elementary School. Four days later, another Asian girl, M., saw a White male pull his car over to the side of the road as she walked to Hidalgo Elementary School. As she walked past the car, the man motioned for her to come over. M. saw the man was masturbating.

On February 21, 2000, Detective Byers contacted B. because B. has seen the license plate of the suspect's vehicle. After determining B. has transposed two of the letters, Byers ran the information through the Department of Motor Vehicles and learned the vehicle was registered to Petitioner.

Byers then compiled two photographic lineups containing pictures of Petitioner. She showed the first lineup to V. and B., but neither was able to identify a suspect. Byers also

1   showed the first lineup to M. who identified Petitioner as the man she had seen.  Later at trial, M.
2   said she did not believe that she had picked the right person because she was confused.
3       The following morning, Byers and other officers followed Petitioner as he got into his
4   burgundy-colored car and drove through the area of Hidalgo Elementary School and then to an
5   appointment with his parole officer.  It was a school day and there were children present.  At one
6   point, Petitioner pulled into the Hidalgo Elementary School parking lot.
7       When Petitioner arrived at the parole office, he was arrested.  The interior of his car was
8   very messy and there was trash on the floor.  Officers took a white T-shirt from the car, which
9   was damp.  At first Petitioner claimed he used the shirt to clean up a liquid spilled in the car.  He
10  then claimed he had picked up a prostitute the day before and used the T-shirt to wipe his
11  genitals after she orally copulated him.
12      In March 2000, Byers showed the second lineup containing Petitioner's photograph to P.
13  and she identified Petitioner as the man who had sexually assaulted her.
14      **Evidence Presented at Trial**
15      At trial, P. was six years old and testified via closed-circuit television from another room
16  in the courthouse.  P. stated she had been watching some people play ball when a bad man
17  grabbed her.  The man grabbed her shirt and arm and took her to a red car behind a house.  He
18  bent her over and put her mouth on his penis.  P. also testified the man "put something in my
19  butt."  When asked if the man touched her anywhere else, P. first said, no, but then said the man
20  touched her on her back.
21      P. further testified she was on the car seat on her stomach and could not see the man.  P.
22  explained that the man hurt "my butt" and where she went pee.  When asked a second time if the
23  man hurt her where she went pee, she said no.  P. said the man hurt her on her bottom.  She
24  stated that while she was face down, the man put something in her vagina.
25      P. was brought into the courtroom and asked to identify her assailant.  She was asked, "Is
26  the bad man here?"  She replied, "Yeah."  But when she was asked, do you see him, she shook
27  her head no.  P. returned to the room outside the courtroom and said, "There was someone that
28  looked like him, but I didn't know if it was him or not."  The prosecutor asked her if, when she

1  went into the courtroom, she saw someone that looked like the bad man. She said she did. P.
2  was then brought back into the courtroom and identified Petitioner as her assailant.
3        P. testified that she remembered telling the policeman on the day of the assault that the
4  bad man had a beard, but not a moustache. P. was shown pictures of Petitioner's car and also
5  Pedro Elias' car (a car stopped the day of the incident). P. described Petitioner's car as purple
6  and Elias' car as red. P. was shown a photograph of Elias and asked if he was the bad man. She
7  answered no.
8        During cross-examination, P. was asked if anyone had helped her make the identification.
9  P. replied, "Yeah," but the court did not believe that she understood the question and asked the
10 interpreter to repeat it. P. then testified, "I knew who he was all by myself."
11       DNA testing was done by the Department of Justice. On January 19, 2000, criminalist
12 Scott Lewis received the sexual assault kit containing P.'s checkered pants, T-shirt, blue pants,
13 and sweatshirt. Lewis found stains on the T-shirt and both pairs of pants. He cut out three stains,
14 including one from the hemline of the T-shirt, and placed them in a kit designed for long-term
15 storage.
16       On March 29, 2000, criminalist Edqin Scruggs received a semen-stained T-shirt and a
17 pair of men's underwear collected from Petitioner's car and person when he was arrested. DNA
18 typing was done on the semen stain. On or about April 26, 2000, using Polymerase Chain
19 Reaction or "PCR" DNA testing, Scruggs compared the semen stains from Petitioner's T-shirt to
20 a sample of Petitioner's blood. Analysis showed that the semen stain and Petitioner's blood were
21 identical for the six loci on the sixth chromosome.
22       Scruggs also retrieved the kit prepared by Lewis and extracted the semen found on P.'s T-
23 shirt and DNA typed it. Scruggs compared the semen on P.'s shirt to Petitioner's blood sample
24 and found they were identical or completely congruent.
25       Criminalist Kenneth Penner analyzed the semen stains from P.'s T-shirt and Petitioner's
26 blood sample. Penner used Short Tandem Repeat of "STR" DNA typing. Penner explained that
27 STR is more discriminating than PCR analysis because it looks at the 23 chromosomes
28 collectively, analyzing far more possible alleles, at any possible locus. He compared nine loci

from the semen on P.'s T-shirt and the sample of Petitioner's blood and found that at each loci the samples were indistinguishable. Penner opined that the profile present in the T-shirt and in the sample of Petitioner's blood is found in approximately one in one trillion of the population.

**Defense**

Pedro Elias testified that he was detained on January 10, 2000, by police officers. He was certain he had not been in the area of Winchell Elementary School that morning.

J. was in the third grade at Winchell Elementary School on January 10, 2000. J. saw the man that took the little girl into a car that was red like the photograph of Elias' car. At trial, for the first time, J. identified Petitioner as the man in the red car, although he admitted that the day after the incident he told the police that he could not identify him.

J.'s friend, J.R., testified that he attended Winchell Elementary School at the time of the assault and told the police that the perpetrator was a Mexican man with a beard and a moustache. J.R. said the man's car was red and that he had not seen him except for outside the courtroom a few moments earlier (referring the Elias).

Officer Walzberg testified that she was the first officer to arrive after the assault. P.'s initial description of her assailant, via Officer Chang's translation, was that the suspect was a short, bearded Hispanic man driving a two-door red car. Walzberg showed P. a suspect (Elias) and a car. P. was not certain the suspect was the man who had assaulted her, but she was sure the car was the man's car. On cross-examination, Walzberg testified P. would not communicate with her directly and appeared to be in shock.

Detective Byers testified that she arrested Petitioner on February 22, 2000, and submitted for testing a T-shirt found in his car during the arrest. Byers knew that Petitioner was a section 290 registrant and the suspect in two indecent exposure cases.

**Rebuttal**

Detective Byers stated that she spoke with Detective Mart, the officer who arrested Elias on January 10, 2000. It was Mart's opinion that Elias was not a suspect because no blood was found on his penis or his underwear. Byers agreed that Elias was not the perpetrator because he had no prior sex offenses and because P. did not identify him as the perpetrator.

7

Byers interviewed Petitioner on the day of his arrest. He explained that he had been in the vicinity of the school because he had been paged to come to that location to repair a vehicle.

## DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.   Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.      Ineffective Assistance of Counsel

Petitioner asserts that he was denied the effective assistance of counsel because counsel (1) refused to retest the State's DNA evidence; and (2) refused to test available DNA evidence that would have exonerated him. Petitioner provides no further details or support.

Ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." Strickland v. Washington, 466 U.S. 668, 684 (1984). A claim for ineffective assistance must meet the two-part test advanced by the Strickland court. First, a petitioner must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, [petitioner] must show that the deficient performance prejudiced the

9

defense. Id. at 687. This two-part standard also applies to challenges to guilty pleas based in ineffective assistance of counsel. In the context of a guilty plea, a petitioner must show that (1) his counsel failed to provide reasonable competent advice, and that (2) there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 58-59 (1985).

Petitioner first contends that counsel was ineffective for refusing to retest the State's DNA evidence. As Respondent points out, however, this claim unexhausted. A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. Picard v. Connor, 404 U.S. 270, 276, 92 S.Ct. 509, 512 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996). Petitioner did not include this claim in his appeal, nor did he file a habeas petition with the California Supreme Court. Notwithstanding Petitioner's failure to exhaust, the Court can overlook the exhaustion requirement where the claim can be denied on the merits.

At trial, the State presented DNA evidence that demonstrated that the DNA profile of the semen stains on P.'s T-shirt matched the profile of Petitioner's blood. In his argument, Petitioner asserts that counsel failed to retest this evidence, yet doesn't explain why the evidence warranted retesting. Petitioner simply states that retesting would have exonerated him, but such speculation is insufficient to establish ineffective assistance of counsel. Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001).

Next, Petitioner contends that counsel was ineffective for refusing to test available DNA evidence and believes that this evidence would have exonerated him. This issue was discussed at a closed Marsden hearing conducted several months before trial, where Petitioner explained that semen found on two pairs of P.'s pants was never DNA tested. Opinion, at 9. The Court of Appeal summarizes the Marsden proceeding as follows:

> The court asked counsel about the DNA testing. Counsel explained that P. said there was no genital penetration. Swatches of cloth had been taken from her T-shirt and two pairs of pants. However, the lab reports showed that testing for the presence of sperm had not been done on the pants because they were soaked with urine and therefore, not easily testable. In addition, the semen from P.'s T-shirt matched appellant's DNA.

      Counsel stated that his theory of the case was that the Fresno Police Department had mishandled the evidence, and the semen found on P.'s shirt had transferred from another T-shirt with wet semen on it found in appellant's car. Counsel acknowledged that he and appellant disagreed on how to handle the testing of the pants. Counsel believed the absence of testing on the swatches from P.'s pants suggested reasonable doubt while appellant believed it was exculpatory. The court asked, "So it's a matter of trial tactics and strategy?" Counsel replied, "Right."

      In denying appellant's Marsden motion, the court stated:

> "I have heard you and I've heard your attorney . . . .[Y]ou have your concerns and he's responded to them and I respect your differences, but it appears to me that he's right and you're wrong at this time that there is no basis to grant a Marsden motion, but I invite you to come back during the course of the trial once you look at your notes and there's other issues to bring up and that you convince me that there is some merit to your issues. But as of now I don't find that there's any merit to your issue, and as a matter of tactic and strategy it's the attorney who makes those decisions. The only way you're entitled to make those decisions is if you're representing yourself, and I've not heard that you want to represent yourself nor would I recommend it to you. [Defense counsel] has worked on this case. He is up to speed on it. I'm satisfied of that. He's ready to try the case."

      Days before trial, appellant made a second Marsden motion, arguing that counsel should be replaced because he still refused to have P.'s pants tested for DNA. Appellant reiterated that the DNA on the pants did not belong to him. Defense counsel again refused to do so explaining that the charges of oral copulation and digital penetration did not include a charge alleging penile contact with P.'s genitals. Defense counsel again explained that his defense theory was based on the improper handling of evidence by the police, coupled with a shaky identification of appellant by P. If the pants were tested and appellant's DNA was detected, the prosecution could argue that there were two assailants instead of one.

      Counsel told the court that he thought appellant might be trying to delay the trial noting that appellant had lied to him about his prior record. He advised the court that appellant had told a preposterous story to an employee in defense counsel's office, explaining that he had been masturbating outside of the school on the day P. was assaulted. Appellant opined that possibly some of his ejaculate flew out of his open car window and hit P. and someone else took her into the alley and assaulted her.

      Defense counsel told the court he believed that a single, narrow defense theory was more effective than a shotgun approach. Defense counsel acknowledged that he and appellant had problems communicating based on a difference of opinion regarding trial strategy.

      In denying appellant's second Marsden motion, the court stated:

> ". . . I'm satisfied your attorney is well prepared to defend you in this case. He has a very [good] theory in the case. It's a rational one. It may work. It may not work. The law says that . . . it's for the attorney to decide tactics, and I can't say there's any fault in the way that he's prepared this case for . . . your defense."

Opinion, at 9-11.

1   The Court of Appeal affirmed the trial court ruling, explaining that although Petitioner
2   did not agree with his counsel's tactical decisions, it was not enough to require substitution of
3   counsel. Opinion, at 12. The finding that counsel was not ineffective was not contrary to, or an
4   unreasonable application of, clearly established Supreme Court precedent.
5   As he explained to the trial court, counsel decided not to test P.'s pants for numerous
6   reasons, including the fact that the pants were not easily testable and there was already evidence
7   that linked Petitioner to P. Most importantly, counsel decided not to test the pants because the
8   fact that the pants were not tested was support for his defense theory- that the evidence was
9   mishandled, thereby providing reasonable doubt. As the trial court found, counsel's decision not
10  to test the pants was a tactical decision, and the fact that Petitioner disagreed with this strategy
11  does not mean that counsel was ineffective. A difference in opinion as to trial tactics does not
12  constitute a denial of effective assistance of counsel. United States v. Mayo, 646 F.2d 369, 375
13  (9th Cir. 1981). Indeed, counsel's strategy was reasonable. As counsel pointed out, if testing of
14  the pants revealed the presence of Petitioner's DNA, this of course would be damaging to
15  Petitioner. If testing of the pants revealed someone else's DNA, the prosecution could simply
16  argue that Petitioner and another perpetrator assaulted P. Opinion, at 10.
17  Petitioner's claim is without merit and must be denied.

18  D.    Sentencing Error
19  Finally, Petitioner contends that the trial court improperly applied California sentencing
20  law in imposing his sentencing. Petitioner explains that there was only one victim and one act of
21  continuing sexual abuse, but the court interpreted his offense as involving separate acts.
22  The role of this Court on federal collateral review of a state criminal conviction is limited
23  to determining whether the Petitioner's federal constitutional or other federal rights have been
24  violated and does not extend to review a state's application of its own laws. Jackson v. Ylst, 921
25  F.2d 882, 885 (9th Cir. 1990). Federal courts must defer to the state courts' interpretation of
26  state sentencing laws. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Bueno v. Hallahan, 988
27  F.2d 86, 88 (9th Cir. 1993). Absent a showing of fundamental unfairness, a state court's
28

application or misapplication of its own sentencing laws does not generally justify federal habeas relief. <u>Christian v. Rhode</u>, 41 F.3d 461, 469 (9th Cir. 1994).

Petitioner's claim concerns California Penal Code section 667.6(d), which mandates full consecutive sentences for certain sex offenses committed against the same victim on separate occasions. The trial court determined that Petitioner's crimes against P. constituted four separate acts for purposes of section 667.6(d) and therefore sentenced him consecutively for each of the four acts. The appellate court reviewed the sentence and concluded that, pursuant to California law, there was substantial evidence to find that the acts were committed on separate occasions for purposes of section 667.6(d). Opinion, at 17-18.

Petitioner's claim is not reviewable on federal habeas corpus. His claim involves only the trial court's interpretation of California sentencing law, an interpretation that was upheld by the appellate court. This Court must defer to the state court's interpretation of whether Petitioner's acts constituted separate acts under section 667.6(d). Accordingly, Petitioner's claim must be denied.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that the second amended petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling

1  pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections
2  within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez</u>
3  <u>v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

    IT IS SO ORDERED.

6     **Dated:**   <u>**December 12, 2005**</u>           <u>     **/s/ Dennis L. Beck**     </u>
   3b142a                                           UNITED STATES MAGISTRATE JUDGE